UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL MOTORS LLC,

       Plaintiff,

vs.

                                  Case No.
                                  Hon.

CLARK-CUTLER-MCDERMOTT
COMPANY, CCM AUTOMOTIVE LLC,
AIRLOC LLC, DUFFY'S PARK LLC, CCM
AUTOMOTIVE LAFAYETTE LLC, and
CCM AUTOMOTIVE HILDENBRAN LLC,

       Defendants.

_____/

Lawrence J. Murphy (P47129)
Joseph R. Sgroi (P68666)
Robert M. Riley (P72290)
Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
(313) 465-7000
Email: lmurphy@honigman.com
*Attorneys for General Motors LLC*

_____/

## **GENERAL MOTORS LLC'S VERIFIED COMPLAINT**

Plaintiff General Motors LLC ("GM"), for its Verified Complaint against Defendants Clark-Cutler-McDermott Company, CCM Automotive LLC, AirLoc LLC, Duffy's Park LLC, CCM Automotive Lafayette LLC, and CCM Automotive Hildenbran LLC (collectively, "Defendants"), states:

## INTRODUCTION

1.     This automotive supply dispute presents dire and exigent circumstances.  GM faces imminent shutdown of all of its production facilities across North America due entirely to the bad-faith conduct of Defendants which have, inconceivably, shut down their manufacturing operations as a "nuclear option" tactic in a scheme to extort tens of millions of dollars from GM.

2.     To avoid irreparable and catastrophic harm to GM, GM's thousands of suppliers, and countless employees across North America, GM seeks the immediate issuance of a temporary restraining order ("TRO") and preliminary injunction compelling Defendants to fulfill their obligations under the parties' requirements contracts and to continue supplying all of GM's requirements of the involved production parts, service parts, and assembled goods (the "Component Parts").  GM has no other supplier for the Component Parts.  It will take six months to arrange for a new supplier and test and validate the new parts.  If Defendants are not compelled to continue to supply GM's requirements of

2

Component Parts, GM will be required to shut down all of its North American plants and suffer untold economic damages.  GM will also suffer immeasurable and irreparable injury to its goodwill and reputation, in addition to the catastrophic disruption of the supply chain in the automotive industry and the attending consequences for the economy as a whole.  As many as 6,000 suppliers could be impacted.

3.      This avoidable situation arises from the self-interested and wrongful conduct of the ownership and management of Defendants who, having run their businesses into financial distress, seek only to protect their personal assets and avoid personal liabilities by extorting GM into paying tens of millions of dollars in monies unrelated to the sale of the Component Parts and by demanding releases of liability to leave GM without remedy.  For example, Defendants' ownership and management, using the threat of shutting down GM, have unjustifiably demanded that GM pay all of their businesses' unsecured debt as well as pay off $18 million in underfunded pension liability (for which the owners/management may be held personally liable).

4.      Incredibly, Defendants have elected to shut down their operations to the detriment of their secured and unsecured creditors and their employees, and causing significant damages to GM, notwithstanding GM's willingness to continue

21835428.11

to fund Defendants' ongoing costs of operations as it has done for over two and a half months.  Defendants' only rationale for their actions is an improper effort to extract value for their insiders and owners, who are almost certainly out of the money, at the expense of these real parties in interest who are now owed fiduciary duties from Defendants' officers and directors given Defendants' insolvency.

5.      Defendants' actions are reckless and irresponsible and justify the immediate appointment of a receiver over Defendants' estates so that the receiver can continue to operate Defendants' distressed businesses in order to either effect a going concern sale or an orderly wind-down, which will maximize value for Defendants' creditors and employees and avoid catastrophic damages to GM and the resulting incalculable damage claims against Defendants.

## PARTIES, JURISDICTION, AND VENUE

6.      Plaintiff GM is a Delaware limited liability company with its principal place of business in Detroit, Michigan.

7.      Defendant Clark-Cutler-McDermott Company ("Clark Cutler") is a Massachusetts domestic profit corporation with its principal place of business in Massachusetts.

8.      Defendant CCM Automotive LLC ("CCM") is a Massachusetts limited liability company with its principal place of business in Massachusetts.

4

9.      Defendant AirLoc LLC ("AirLoc") is a Massachusetts limited liability company with its principal place of business in Massachusetts.

10.     Defendant Duffy's Park LLC is a Massachusetts limited liability company with its principal place of business in Massachusetts.

11.     Defendant CCM Automotive Lafayette LLC ("CCM Lafayette") is a Massachusetts limited liability company with its principal place of business in Massachusetts.

12.     Defendant CCM Automotive Hildenbran LLC ("CCM Hildenbran") is a Massachusetts limited liability company with its principal place of business in Massachusetts.[1]

13.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States as defined by 28 U.S.C. § 1332(c)(1).

---

[1] Upon information and belief, certain of Defendants operate from facilities located in Georgia and North Carolina.  As such, while GM has identified the principal place of business of each Defendant, it is anticipated that one or more of the Defendants in fact operate in one or more of Massachusetts, Georgia and North Carolina.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3), in that Defendants consented to personal jurisdiction and venue in this District with respect to this action.[2]

## GENERAL ALLEGATIONS

### The Purchase Orders

15.     Defendants manufacture and supply GM's requirements of various vehicle acoustic insulation parts, service parts, and assembled goods (the "Component Parts").  A list of the Component Parts, by part number, is attached as **Ex. A**.

16.     For more than 45 years, GM and Defendants have entered into various purchase orders, supply agreements, and/or releases (collectively, the "Purchase Orders").  Pursuant to the Purchase Orders, Defendants are obligated to manufacture GM's requirements of the Component Parts.   A copy of a

---

[2] The Terms and Conditions, Interim Agreement, Notes, and Security Agreement (each as defined herein) are each subject to a consent to jurisdiction provision by which Defendants have (a) consented to personal jurisdiction of the state and federal courts located in Oakland County in the State of Michigan, (b) waived any argument that venue in such courts is not convenient, (c) agreed that any litigation initiated by GM related to such agreements may be venued in such courts, and (d) agreed that a final judgment in any such suit shall be conclusive and may be enforced in other jurisdictions.

21835428.11

representative Purchase Order is attached as **Ex. B**.  Defendants are in possession

of a copy of each of the Purchase Orders.[3]

17.    GM uses the Component Parts in nearly every vehicle that GM

manufacturers and assembles in the United States, Canada, and Mexico.  The

Component Parts are integrated primarily in the interior of vehicles for acoustic

insulation, including, but not limited to, behind dashboards, in truck cabs, under

carpets, and in wheel liners.

18.    The Purchase Orders are governed by the GM's General Terms and

Conditions (the "Terms and Conditions").  A copy of the Terms and Conditions is

attached as **Ex. C**.

19.    The Terms and Conditions provide an express acknowledgment that

money damages are not a sufficient remedy for Defendants' breach of the parties'

requirements contracts and that GM is entitled to specific performance and

injunctive relief to enforce the requirements contracts.  Paragraph 26 of the Terms

and Conditions, titled "Specific Performance," provides:

> Seller acknowledges and agrees that money damages will
> not be a sufficient remedy for any actual or threatened
> breach of this Contract by Seller and that, in addition to
> all other rights and remedies that Buyer may have, Buyer

---

[3] The Purchase Orders are too voluminous to attach to this Verified Complaint.
However, a complete set of the Purchase Orders is available upon request.

7

will be entitled to specific performance and temporary, preliminary and permanent injunctive relief in connection with any action to enforce this Contract, without any requirement of a bond or other security to be provided by Buyer.

### The Critical Nature of the Component Parts

20.     Defendants are the sole supplier to GM of the Component Parts.

21.     The sole source supply method means that GM obtains all of its requirements of the Component Parts from Defendants.

22.     Defendants have always acknowledged and agreed to supply all of GM's requirements of Component Parts.  In fact, since at least the early 1970s, GM has issued hundreds of Purchase Orders to Defendants pursuant to which Defendants have supplied millions of Component Parts to GM.

23.     The Component Parts supplied by Defendants are unique and essential components of GM's vehicle manufacture and assembly operations throughout North America.

24.     GM, like other automotive vehicle manufacturers, utilizes a "just-in-time" inventory delivery system.

25.     Under the just-in-time inventory delivery system, GM does not maintain a significant inventory of Component Parts, but rather relies on frequent

shipments of Component Parts by Defendants to 100% of GM's production plants in North America pursuant to the terms of the Purchase Orders.

26.   GM typically assembles the Component Parts into vehicles within a few hours of their delivery.

27.   Without sufficient quantities of Component Parts, GM cannot maintain production of vehicles at its assembly facilities.

28.   An alternate source of supply of Component Parts is not readily available because Defendants manufacture Component Parts using specially manufactured and unique tooling, and a proprietary process.

29.   Even one day's disruption in the supply of Component Parts could cause a shutdown of GM assembly operations.  If Defendants do not immediately resume supplying Component Parts, GM's North American plants will be shut down and all vehicle production will be ceased.

30.   A disruption in the supply of Component Parts would also cause a catastrophic disruption in the supply chain and the operations of countless GM suppliers, dealers, customers, and other stakeholders.  There are approximately 6,000 automotive suppliers that supply to, and depend upon, the operations of GM's North American plants.  Depending on the level of their business with GM, these suppliers will also be directly, and potentially significantly, harmed by

9

Defendants' failure to ship Component Parts.  Tens of thousands of workers would potentially be laid off in the event GM's North American operations are shut down.

31.    GM's damages that would result from such a shutdown would be in the millions of dollars per plant per day.  Further, GM would suffer loss of customer relations and goodwill as a result of its inability to deliver vehicles and replacement parts as ordered by customers, all of which would constitute damage claims against Defendants.

### Initial Request from Defendants for GM Accommodations

32.    On or about March 1, 2016, Defendants notified GM that they were in default under their senior secured credit facility with Wells Fargo Bank, National Association ("Wells Fargo"), and that absent accommodations from GM, Wells Fargo would foreclose on its security interest and Defendants would be forced to shut down operations.  These requested accommodations included, but were not limited to, payment by GM of increased Component Part prices over the agreed-upon prices set forth in the Purchase Orders, immediate payment of all outstanding GM accounts payable, payment on a hyper-accelerated basis for Component Parts shipped by Defendants' going forward, and the funding of any budget shortfalls necessary to continue Defendants' operations.

### Initial Loans and Security Agreement

33.    While   GM   and   Defendants   were   negotiating   an   interim accommodation agreement, on or about March 13, 2016, Defendants informed GM that Defendants would be forced to immediately shut down operations without emergency funding from GM.

34.    As a result of Defendants' request, and in order to enable Defendants to continue producing Component Parts, on March 14, 2016, GM provided Defendants with a $300,000 secured loan.  Defendants are in possession of a copy of the documents evidencing the $300,000 secured loan.  A copy of the March 14, 2016 Secured Promissory Note is attached as **Ex. D** (the "March 14 Note").

35.    On March 15, 2016, again to ensure the flow of critical Component Parts, GM provided Defendants with an additional $700,000 secured loan. Defendants are in possession of a copy of the documents evidencing the $700,000 secured loan.  A copy of the March 15, 2016 Secured Promissory Note is attached as **Ex. E** (the "March 15 Note").

36.    On March 15, 2016, GM and Defendants entered into an Amended and Restated Security Agreement (the "Security Agreement"), pursuant to which Defendants granted to GM a security interest in and lien on substantially all of their assets (as defined in the Security Agreement, the "Collateral") then owned or

11

at any time thereafter acquired by Defendants, second in priority only to the liens and security interests of Wells Fargo.  Defendants are in possession of a copy of the Security Agreement.

37.   On or about March 15, 2016, GM perfected the security interests granted by Defendants pursuant to the Security Agreement by filing UCC-1 financing statements with the Secretary of State for the State of Massachusetts.

38.   On March 23, 2016, GM provided Defendants with an additional $950,000 secured loan.  Defendants are in possession of a copy of the documents evidencing the $950,000 secured loan.  A copy of the March 23, 2016 Secured Promissory Note is attached as **Ex. F** (the "March 23 Note").

## The Interim Accommodation Agreement

39.   On or about April 1, 2016, following extensive negotiations, GM, Defendants, and Wells Fargo entered into an Interim Accommodation Agreement (as amended, the "Interim Agreement").  Defendants are in possession of a copy of the Interim Agreement, along with the amendments thereto.  A copy of the Interim Agreement including the amendments thereto is attached as **Ex. G**.

40.   Also on April 1, 2016, Defendants and Wells Fargo entered into a Second Forbearance Agreement, pursuant to which, among other things, Wells Fargo, subject to certain terms and conditions, agreed to forbear from exercising its

rights and remedies under its credit agreement with Defendants through September 30, 2016.  A copy of the Second Forbearance Agreement is attached as **Ex. H**.

41.    Pursuant to the Interim Agreement, GM provided substantial financial accommodations to Defendants to ensure production of the Component Parts through the Interim Agreement's expiration on April 29, 2016.   Among other things, GM agreed to (i) negotiate potential price increases for the Component Parts, (ii) immediately pay all outstanding accounts payable, (iii) pay for all Component Parts shipped by Defendants during the term of the Interim Agreement on a "net instant" basis, and (iv) fund any budget shortfalls necessary to continue Defendants' operations through a combination of loans and Component Part price surcharges (effectively a lump sum temporary price increase).   Defendants also requested that GM resource certain Component Parts to other suppliers, as Defendants would be unable to meet their obligations under the Purchase Orders even with the accommodations being provided by GM, which GM agreed to do at significant cost and expense.

42.    In the Interim Agreement, Defendants provided GM with an irrevocable and exclusive option to purchase: (i) any or all machinery and equipment used in the production of Component Parts; (ii) any returnable containers or dunnage (along with any related accessions, attachments, parts,

13

accessories, substitutions, replacements, documents, software, and appurtenances, as applicable) used in the production of Component Parts; (iii) any tooling which Defendants assert is not owned by GM and which is not subject to a purchase order issued by GM; and (iv) all of Defendants' Component Parts, raw-materials (including purchased components) and finished goods inventory related exclusively to the Component Parts.

43.    In the Interim Agreement, Defendants acknowledged and agreed that GM owns and has an immediate right to possession of any and all tooling used in the production of the Component Parts that Defendants did not specifically identify in writing as not owned by GM (the "GM Tooling").  Specifically, Defendants agreed that all such tooling is (i) owned by GM (or affiliates of GM, or another supplier to GM); and (ii)  being held by Defendants and, to the extent that Defendants have transferred the GM Tooling to third parties, by such third parties, as bailees-at-will.  Defendants never provided GM with the required list of tooling used in production of Component Pats that Defendants believed was not owned by GM; as such, all tooling is acknowledged as GM Tooling under the Interim Agreement.

21835428.11

44.     The GM Tooling located in Defendants' facilities is unique and necessary to the manufacture of each of the over 400 parts supplied by Defendants to GM.  The GM Tooling is used for no other purpose or customer of Defendants.

45.     The Interim Agreement contemplated that GM and Defendants would negotiate in good faith the terms of a final accommodation agreement that would replace and supersede the Interim Agreement, and which would include long-term price adjustments for the Component Parts, with the final agreement continuing through at least September 30, 2016.

46.     The Interim Agreement also included an agreement by GM and Defendants to negotiate the time frame and other terms and conditions for the process of a sale of Defendants' businesses.  In connection therewith, the Interim Agreement required Defendants to promptly engage an investment banker for this purpose.

47.     On or about April 29, 2016, GM and Defendants entered into the First Amendment to Interim Accommodation Agreement, pursuant to which, among other things, the parties extended the term of the Interim Agreement through June 3, 2016 (the "First Amendment").  The Defendants are in possession of a copy of the First Amendment.

21835428.11

48.    Prior to the parties executing the First Amendment, Defendants retained Conway MacKenzie, Inc. as their investment banker to run a sale process for their businesses.  The First Amendment included milestone dates for that sale process.

49.    During the term of the Interim Agreement, including the extensions pursuant to the amendments thereto, GM provided Defendants with additional secured loans of $425,000 on April 25, 2016, $270,000 on May 6, 2016, $185,000 on May 13, 2016, $125,000 on May 23, 2016, $320,000 on May 27, 2016, and $175,000 on June 10, 2016.  Defendants are in possession of copies of the documents evidencing the foregoing secured loans.  Copies of the secured promissory notes reflecting the foregoing are attached as **Ex. I**, **Ex. J**, **Ex. K**, **Ex. L**, **Ex. M**, and **Ex. N**, respectively.  Each of the foregoing together with the March 14 Note, March 15 Note and March 23 Note are referred to, collectively, as the "Notes."  Each of the Notes is secured as provided in the Security Agreement.

### Inability to Reach a Final Accommodation Agreement

50.    In accordance with the Interim Agreement, the parties attempted to negotiate a final accommodation agreement.  During those negotiations, it became clear that a continuation of the Defendants' businesses as going concerns under

16

current ownership was not sustainable, and that either a sale or wind-down of the businesses would need to occur.

51.     As the parties negotiated the terms of a final accommodation agreement, Defendants informed GM, for the first time, that in order for Defendants to continue production of Component Parts, the final accommodation agreement would need to include more than just increases in the price of Component Parts and a commitment by GM to fund any budget shortfall. Defendants further demanded that GM: (i) pay all of Defendants' unsecured creditors in full (and use the proceeds of a sale of Defendants' businesses to make those payments prior to GM obtaining any repayment of GM's secured loans); (ii) pay the significant pension withdrawal liability that would be triggered by the wind-down of the Defendants' business in Franklin, Massachusetts or other termination of the collective bargaining agreement at the Franklin plant due to their failure to properly fund their pension obligation; (iii) permit Defendants to exclude certain real estate and the AirLoc business from any sale or wind-down and release any claims GM may have against these entities or the proceeds of such assets; and (iv) provide a full and complete release of any and all claims against Defendants and any of their affiliates, employees, officers, directors or equity holders.  The stated reason for these demands was Defendants' owners' desire to walk away

21835428.11

from any sale or wind-down of their businesses with ownership of their real estate and the AirLoc business intact and, effectively, a full and complete release of any and all potential claims, including any claims for piercing the corporate veil and any pension withdrawal liability that could attach to the owners or the real estate owned by certain of Defendants' affiliates.

52.     Defendants did not raise these demands prior to a meeting between GM and Defendants on May 25, 2016.  At that meeting, Defendants made clear that unless GM agreed to each of these demands, Defendants would immediately cease operations and cease shipments of Component Parts.  Defendants' tactics in this regard were in no way used to preserve the going concern value of Defendants' businesses, preserve jobs for their employees, or maximize potential recoveries to creditors; rather, they were intended to insulate Defendants' owners from potential personal liability upon the completion of a sale or wind-down of Defendants' businesses.  Such actions are not in the best interest of Defendants, their estates, or their creditors, but are solely for the benefit of Defendants' insiders and owners.

53.     On June 2, 2016, Defendants informed GM that the likely amount of the pension withdrawal liability from the Defendants' Franklin location would be approximately $18 million (with a present cash value settlement amount of

approximately $8 million), and that Defendants would consider capping the total value of the funding sought from GM as part of a final agreement.

54.     On June 3, 2016, GM and Defendants entered into the Second Amendment to Interim Accommodation Agreement (the "Second Amendment"), pursuant to which, among other things, GM and Defendants extended the term of the Accommodation Agreement through June 17, 2016.  The Defendants are in possession of a copy of the Second Amendment.

55.     On June 9, 2016, Defendants revised their demand that in order to continue to operate past June 17, 2016, Defendants would cap the payments to be made by GM under the final agreement at $19 million plus the amount of any loans previously provided by GM.

56.     Defendants defaulted under the Interim Agreement by, among other things: (i) failing to operate the business in accordance with the budget set forth therein by failing to make required payments to vendors and other third-parties; and (ii) failing to conduct the sale process under the guidelines set forth in the Second Amendment.  These defaults constitute Events of Default under the Interim Agreement.

21835428.11

57.    Notwithstanding GM's continued good faith negotiations to ensure a continued supply of Component Parts, on June 17, 2016, the Interim Agreement expired.

58.    As of June 17, 2016, GM has paid Defendants $3.45 million in Component Part price surcharges (lump sum temporary price increases) under the Interim Agreement.

59.    As of June 17, 2016, GM has provided Defendants $3.45 million in loans under the Interim Agreement (in addition to the $1.95 million in loans made in March 2016 prior to the parties' execution of the Interim Agreement).

**GM Has Been and Remains Willing to Fund Defendants' Operations**

60.    GM offered, as a part of a final accommodation agreement and otherwise, to continue funding Defendants' operating requirements on the terms of the Interim Agreement, including funding various employee-related expenses, during a sale process and, if a sale could not be consummated, an orderly wind-down of Defendants' businesses.

61.    GM remains willing to fund Defendants' continued operations.  GM's offer protects the value of its and Wells Fargo's collateral, maximizes the value of Defendants' estates for the benefit of all creditors, and provides material benefits to

20

Defendants' employees.  Moreover, GM's offer to fund on this basis does not harm any party, including Defendants' owners.

### Defendants Repudiated the Purchase Orders

62.    Notwithstanding GM's willingness to continue to fund Defendants' operations, Defendants are refusing to negotiate in good faith and stand by their extortionate demands for monies and releases of liability from GM.  GM has been informed of an announcement by Defendants that, at 2:00 p.m. today, June 17, 2016, all temporary employees will be sent home because Defendants have no money to pay them and that they should not report to work on Saturday, June 18, 2016.  There are about 50-60 temporary employees, representing about 25% of Defendants' workforce.  Weekend production is in jeopardy.  Further, GM, upon information and belief, has learned that Defendants' employees have been instructed not to report for work on Monday, June 20, 2016.  It remains unclear whether production critical to GM's operations will occur tomorrow, Saturday, June 18, 2016.

63.    Based on all of the foregoing, including, specifically: (i) the expiration on June 17, 2016 of the Interim Agreement; (ii) Defendants' unreasonable demands and refusal to negotiate in good faith; and (iii) the information about Defendants' direction to their employees to not report to work on June 20, 2016,

GM, on June 17, 2016, issued a demand letter for adequate assurance of performance of the parties' requirements contracts and Purchase Orders.  A copy of the demand letter for adequate assurance of performance is attached as **Ex. O**.

64.     Defendants failed to provide adequate assurance of performance by the 2:00 p.m. response deadline on June 17, 2016, thereby repudiating and breaching the parties' various agreements as described herein.

## GM Faces Immediate and Irreparable Harm

65.     The Component Parts are essential to GM's North American vehicle manufacturing and assembly operations.

66.     The quantities of some Component Parts that GM has on hand are insufficient to support vehicle assembly operations; GM plants will begin to shut down on Monday, June 20, 2016 with the majority shutting down mere days thereafter.

67.     Given the quantities of Component Parts that GM has on hand and the time it will take to resource production, if Defendants fail to resume supplying GM with Component Parts, it is certain that vehicle manufacturing and assembly operations will cease at all of GM's North American plants.

68.     The damages GM would suffer as a result of Defendants' failure to continue supplying GM with Component Parts would be substantial, but difficult,

21835428.11

if not impossible, to calculate.  Because Defendants supply Component Parts to each of GM's 17 North American production plants, GM will be forced to shut down production in all of North America and attempt to resource the Component Parts to alternative suppliers while facing significant and material losses and liabilities.  The damages GM would sustain from such a shutdown would be in the millions of dollars per plant per day.  Further, GM would suffer loss of customers and goodwill as a result of its inability to timely deliver vehicles as ordered by customers.

69.    Defendants' performance of their obligations under the parties' requirements contracts would reduce the harm to GM and the automotive industry as a whole.

70.    The damages resulting from Defendants' refusal to perform their obligations under the parties' requirements contracts will be substantial and in an amount well beyond Defendants' financial ability to pay, further rendering GM without an adequate legal remedy.

71.    Moreover, Defendants' coupling of their unreasonable demands and threat to shut down all of GM's plants across North America with demands to carve out certain assets and for a release in favor of Defendants' affiliates, employees, officers, directors and equity holders is intended to deprive GM of its

23

ability to recover any of its damages for the direct and improper benefit of Defendants' insiders.

## COUNT I

### Specific Performance
### of the Parties' Requirements Contracts / Purchase Orders

72.    GM incorporates paragraphs 1 through 71.

73.    The requirements contracts are mutually binding on GM and Defendants.  Under the requirements contracts, Defendants agreed to supply GM with all of its requirements of Component Parts.

74.    Since at least the early 1970s, Defendants have supplied all of GM's requirements of Components Parts; to date, millions of the Component Parts have been shipped to, and paid for by, GM pursuant to the Purchase Orders.

75.    GM has fully complied with all provisions of, and has performed all of its obligations under, the requirements contracts.

76.    GM has paid Defendants for all Component Parts purchased pursuant to the requirements contracts.

77.    Defendants' obligations and duties under the requirements contracts are clearly ascertainable and explicit enough to warrant enforcement.

78.    If Defendants do not adequately perform their obligations under the requirements contracts, GM will have no adequate remedy at law for the harm

24

caused by Defendants' breaches.  GM cannot obtain the Component Parts from any other source, and there will be catastrophic disruption in the supply chain.  GM will also suffer immeasurable damage to its reputation and goodwill.

79.     GM is entitled to specific performance of the requirements contracts pursuant to the Terms and Conditions and pursuant to MCL § 440.2716 and otherwise applicable law and, in addition, Defendants are estopped from denying the existence of a requirements contract and their obligations as the sole source supplier of Component Parts.

WHEREFORE, GM respectfully requests that the Court:  (a) order Defendants or any receiver appointed by the Court pursuant to GM's motion for the immediate appointment of a receiver, including by way of a TRO and preliminary injunction, to specifically perform their obligations under the parties' requirements contracts including, but not limited to, by continuing to timely produce and deliver all of GM's requirements of Component Parts as required by GM's Purchase Orders; (b) award GM its costs, including attorney's fees; and (c) award such other relief to GM as is proper and just.

## COUNT II

**Breach of Contract**
**(Requirements Contracts / Purchase Orders)**

80.     GM incorporates paragraphs 1 through 79.

81.     Valid and binding requirements contracts exist between GM and Defendants obligating Defendants to supply all of GM's requirements of Component Parts.

82.     Defendants have materially repudiated and breached and anticipatorily repudiated the parties' requirements contracts by, among other things, indicating that they are unwilling or unable to perform their obligations under the Purchase Orders, threatening to cease shipments of Component Parts to GM, and making extra-contractual payment demands.

83.     If Defendants do not immediately resume supplying Component Parts in compliance with the parties' requirements contracts, GM will be forced to shut down all of its North American plants while undertaking the lengthy process (approximately 6 months) of seeking an alternative supplier, causing massive damages to GM, in addition to layoffs of employees and loss of corporate goodwill in the industry; but more importantly, Defendants will cause an interruption in the assembly and production of every vehicle manufactured and assembled at GM's North American plants and thereby cause catastrophic damages to the supply chain, including but not limited to, GM's more than 6,000 suppliers, dealers, customers, and other stakeholders.

84.    Paragraph 25 of the Terms and Conditions allows GM to recover its attorney's fees costs, and other legal expenses resulting from, incident to, or arising out of Defendants' breaches.

85.    GM has performed all of its obligations under the Purchase Orders.

86.    As a result of Defendants' repudiation and breaches, GM has been damaged and will be irreparably harmed if Defendants do not immediately resume supplying GM's requirements of Component Parts.

WHEREFORE, GM respectfully requests that the Court: (a) enter a judgment in favor of GM and against Defendants in the amount of all damages caused by or arising from Defendants' breaches of the parties' requirements contracts; (b) award GM its costs, including attorney's fees; and (c) award such other relief to GM as is proper and just.

## COUNT III

### Breach of Contract
### (Interim Agreement)

87.    GM incorporates paragraphs 1 through 86.

88.    The Interim Agreement is a valid and enforceable contract between GM and Defendants.

89.    Defendants materially breached the Interim Agreement by, among other things: (i) failing to operate the business in accordance with the budget set

27

forth therein by failing to make required payments to vendors and other third-parties; and (ii) failing to conduct the sale process under the guidelines set forth in the Second Amendment.

90.     Defendants' breaches constitute Events of Default under and as defined in the Interim Agreement.

91.     The occurrence of an Event of Default under the Interim Agreement triggers various of GM's rights under the Interim Agreement including, but not limited to, the Options and the License (as each is defined in the Interim Agreement), as well as Defendants' obligations to, among other things, fully cooperate with GM's resourcing of Component Parts to alternative suppliers, including by providing GM and its agents, representatives, and successor suppliers with immediate access to Defendants' facilities and allowing GM to utilize Defendants' employees as necessary to complete the resourcing.

92.     The occurrence of an Event of Default under the Interim Agreement also terminates various of GM's obligations under the Interim Agreement including, among other things, any limitation on GM's right to resource production of Component Parts from Defendants.

93.     GM has performed all of its obligations under the Interim Agreement.

94.     As a result of Defendants' breaches, GM has been damaged.

WHEREFORE, GM respectfully requests that the Court: (a) enter a judgment in favor of GM and against Defendants in the amount of all damages caused by or arising from Defendants' breaches of the Interim Agreement; (b) declare that all of GM's rights and Defendants' obligations under the Interim Agreement that are triggered upon an Event of Default are fully enforceable by GM; (c) declare that all of GM's obligations under the Interim Agreement that are terminated upon an Event of Default are no longer binding on or enforceable against GM; (d) award GM its costs, including attorney's fees; and (e) award such other relief to GM as is proper and just.

## COUNT IV

### Breach of Contract
### (Notes and Security Agreement)

95.    GM incorporates paragraphs 1 through 94.

96.    The Notes and Security Agreement are valid and enforceable contracts between GM and Defendants.

97.    Pursuant to the terms of the Notes, Defendants agreed to pay all unpaid amounts including, without limitation, principal, interest, and applicable fees and costs, upon demand by GM.

98.    GM has performed all of its obligations under the Notes and Security Agreement.

99.     Defendants have failed and/or refused to make payments as due under the Notes and, upon information and belief based upon Defendants' decision to shut down their operations, have no ability to pay the amounts due under the Notes.

100.    Defendants' failure to make payments due under the Notes constitutes a breach of the Notes and the Security Agreement and an Event of Default under and as defined in the Notes and Security Agreement.

101.    As a direct and proximate result of Defendants' breaches, GM has been damaged in the form of, among other things, money damages relating to amounts due and owing under the Notes.

102.    As of June 17, 2016, the balance due on the Notes was $3.45 million, plus interest, costs, and other charges and fees including attorney's fees as provided for in the Notes.

WHEREFORE, GM respectfully requests that the Court: (a) enter a judgment in favor of GM and against Defendants in the amount due and owing under the Notes in an amount in excess of $3.45 million plus continuing default interest and accruing costs and attorney's fees; and (b) award such other relief to GM as is proper and just.

<u>**COUNT V**</u>

**Declaratory Judgment**

103.    GM incorporates paragraphs 1 through 102.

104.    GM is entitled to a declaration that valid and enforceable requirements contracts exist between the parties that obligate Defendants to supply to GM all of GM's requirements of Component Parts.

105.    The requirements contracts are reflected in and confirmed by, among other things, the following:

- The bidding, quoting, and award process, which resulted in GM awarding Defendants (as Defendants requested) contracts to be the sole supplier of Component Parts;

- More than 400 GM Purchase Orders;

- The Terms and Conditions;

- The course of performance and the course of dealing between GM and Defendants from the 1970s to the present;

- The fact that GM has purchased all of its requirements of Component Parts solely from Defendants; and

- Never before have Defendants taken the position that they had anything other than requirements contracts with GM.

106.    GM is entitled to a declaration that it has no obligations and/or commitments to Defendants other than, or in addition to, those obligations

expressly provided for in the Purchase Orders, the Interim Agreement, the Notes, and the Security Agreement.

107.   GM is entitled to a declaration that it has not breached any obligation or commitment to Defendants and that it has no liability to Defendants.

108.   GM is entitled to a declaration that the requirements contracts between the parties obligate Defendants to continue to timely supply all of GM's requirements of Component Parts.

109.   GM is entitled to a declaration that Defendants' demands are unlawful and constitute a breach of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement.

110.   GM is entitled to a declaration that, to the extent that any amounts remain owing to Defendants under the requirements contracts, the Interim Agreement, the Notes, or the Security Agreement (all of which GM denies), GM's claims for damages resulting from Defendants' breaches of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement arise from the same transaction and/or contract.

111.   GM is entitled to a declaration that, to the extent that any amounts remain owing to Defendants under the requirements contracts, the Interim Agreement, the Notes, or the Security Agreement (all of which GM denies), such

claims shall be reduced by the amount of GM's claims for damages resulting from Defendants' breaches of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement under the doctrines of setoff and/or recoupment.

112.   GM is entitled to a declaration that, in addition to its common-law recoupment and setoff rights, to the extent that any amounts remain owing to Defendants under the parties' requirements contracts, the Interim Agreement, the Notes, or the Security Agreement (all of which GM denies), such claims shall be reduced by the amount of GM's claim for damages resulting from Defendants' breaches of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement under the Terms and Conditions.

113.   GM is entitled to a declaration that it owns the GM Tooling free and clear of all liens, claims, and other encumbrances.

114.   GM is entitled to a declaration that it has the right, at its sole discretion and at a time of its choosing, to take immediate possession of the GM Tooling.

115.   GM is entitled to a declaration that Defendants have materially breached the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement.

116.   GM is entitled to a declaration that Defendants have repudiated the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement.

117.   By reason of the foregoing, there is a case of actual controversy between the parties within the jurisdiction of this Court under 28 U.S.C. § 2201(a), and the Court can declare the rights and other legal relations of the parties.

WHEREFORE, GM respectfully requests that the Court, pursuant to Federal Rule of Civil Procedure 57, MCL § 600.605, and otherwise, declare that:

(a)   Defendants remain obligated to continue to timely supply all of GM's requirements of Component Parts;

(b)   GM owes no obligations or commitments to Defendants other than, or in addition to, those obligations expressly provided for in the parties' requirements contracts, the Interim Agreement, the Notes, or the Security Agreement;

(c)   GM has fully performed all of its obligations and commitments to Defendants under the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement;

(d)   GM has not breached any obligation or commitment to Defendants and has no liability to Defendants;

(e)   Defendants' demands are unlawful and constitute a breach and repudiation of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement;

(f)   To the extent that any amounts remain owing to Defendants under the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement, GM's

34

claim for damages resulting from Defendants' breaches of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement arise from the same transaction and/or contract;

(g)     To the extent that any amounts remain owing to Defendants under the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement, such claims shall be reduced by the amount of GM's claim for damages resulting from Defendants' breaches of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement under the doctrines of setoff and/or recoupment;

(h)     To the extent that any amounts remain owing to Defendants under the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement, such claims shall be reduced by the amount of GM's claim for damages resulting from Defendants' breaches of the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement under the Terms and Conditions;

(i)     GM owns the GM Tooling free and clear of all liens, claims, and other encumbrances;

(j)     GM has the right, at its sole discretion and at a time of its choosing, to take immediate possession of the GM Tooling;

(k)     Defendants have materially breached the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement;

(l)     Defendants have repudiated the parties' requirements contracts, the Interim Agreement, the Notes, and the Security Agreement;

(m)     GM is entitled to its costs, including attorney's fees; and

(n)     GM is entitled to such other relief as is proper and just.

21835428.11

## COUNT VI

### Claim and Delivery

118.   GM incorporates paragraphs 1 through 117.

119.   The parties' requirements contracts, the Terms and Conditions, and the Interim Agreement confirm—in explicit, unambiguous detail—GM's ownership and possessory rights in the GM Tooling and equipment used in the production of Component Parts.  Because Defendants possess the only set of tools available to manufacture Component Parts, GM included this language in the parties' requirements contracts, the Terms and Conditions, and the Interim Agreement to ensure that it could move production of Component Parts to a new supplier without disruption.

120.   Under Michigan law, including MCL § 600.2920 and MCR 3.105, GM is entitled to immediate possession of the GM Tooling.

121.   The GM Tooling is currently in Defendants' possession, custody, or control.

122.   The GM Tooling consists of independent pieces of tangible personal property.

123.   GM owns the GM Tooling; Defendants have not disputed GM's ownership.

21835428.11

124.   As provided by the terms of the parties' requirements contracts, including the Terms and Conditions, as well as the Interim Agreement, Defendants have no legal interest in the GM Tooling.

125.   At all times, and as described above, GM has fully complied with its obligations under the parties' requirements contracts and the Interim Agreement.

126.   To the extent that the parties' requirements contracts, the Terms and Conditions, or the Interim Agreement impose any conditions precedent to GM's right to take possession of the GM Tooling, GM has satisfied those conditions.

127.   Under the parties' requirements contracts, the Terms and Conditions, the Interim Agreement, and applicable law, GM is entitled to immediate possession of the GM Tooling.

128.   GM has the right to demand, in its sole discretion and at a time of GM's choosing, that Defendants surrender the GM Tooling to GM.

129.   For example, in the event of (a) dissolution of any of Defendants or cessation of any of their operations, by a receiver or otherwise, or (b) a decision by GM to resource the manufacture of some of all of the Component Parts to an alternate supplier, GM has the right to immediately remove the GM Tooling.

WHEREFORE, GM respectfully requests that the Court: (a) enter a judgment awarding GM the right to take immediate possession of the GM Tooling

to GM or its designees; (b) enter a judgment in GM's favor and against Defendants sufficient to compensate GM for any forms of economic loss arising from any attempt by Defendants to unlawfully possess the GM Tooling, including, without limitation, incidental damages, consequential damages, lost profits, lost goodwill, interest, costs, and attorney fees; and (c) award such other relief to GM as is proper and just.

Respectfully submitted,

HONIGMAN MILLER SCHWARTZ AND COHN LLP
Attorneys for Plaintiff General Motors LLC

By: /s/ Lawrence J. Murphy
    Lawrence J. Murphy (P47129)
    Joseph R. Sgroi (P68666)
    Robert M. Riley (P72290)
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3506
(313) 465-7000
Email: lmurphy@honigman.com

## **VERIFICATION**

I, Mark W. Fischer, the Director, Supply Risk Management, for General Motors LLC ("GM"), declare that I am authorized to verify the foregoing Verified Complaint on behalf of GM.  Pursuant to the provisions of 28 U.S.C. § 1746, I further verify under penalty of perjury that the allegations made in the foregoing Verified Complaint are true and correct.

_____
Mark W. Fischer

Dated: June 17, 2016

STATE OF MICHIGAN          )
                          MACOMB KMS )
COUNTY OF ~~OAKLAND~~      )

KELLY M SCOFIELD
Notary Public, State of Michigan
County of Macomb
My Commission Expires 08-28-2017
Acting in the County of MACOMB

The foregoing instrument was acknowledged before me this _17_ day of June, 2016 by Mark W. Fischer.

_____
Notary Public, MACOMB, County, Michigan

My commission expires: 08/28/2017

21835428.11

39

## CERTIFICATE OF SERVICE

I certify that on June 17, 2016, I electronically filed with the Clerk of the Court the foregoing document using the ECF system, and have served the foregoing document via email to Defendants' counsel shown below:

| | |
|---|---|
| Charles A. Dale III, Esq. | Melissa Schwab Wright, Esq. |
| K&L Gates LLP | Goodwin Proctor LLP |
| State Street Financial Center | Exchange Place |
| One Lincoln Street | 53 State Street |
| Boston, MA 02111-2950 | Boston, MA 02109 |
| (617) 261-3112 (Direct) | 617-570-8233 (Direct) |
| (617) 510-0734 (Cell) | MSchwabWright@goodwinprocter.com |
| Chad.dale@klgates.com | |

HONIGMAN MILLER SCHWARTZ
 AND COHN LLP

By: /s/ Lawrence J. Murphy
       Lawrence J. Murphy (P47129)
2290 First National Building
660 Woodward Avenue
Detroit, Michigan 48226-3506

Dated: June 17, 2016          (313) 465-7488